```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF TENNESSEE
 2                          NASHVILLE DIVISION

 3
      UNITED STATES OF AMERICA       )
 4                                   )
      vs                             )    Case No. 3:18-cr-00237-1
 5                                   )
      TERIOUS D. RAMEY               )
 6

 7    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 8
                         BEFORE THE HONORABLE
 9
           WILLIAM L. CAMPBELL, JR., U.S. DISTRICT COURT
10
                      TRANSCRIPT OF SENTENCING
11
                          January 24, 2020
12

13    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

14    APPEARANCES:

15    For the Government:        Juliet Aldridge
                                 Dean Atyia
16                               US Attorney's Office
                                 110 Ninth Avenue, S
17                               Suite A961
                                 Nashville, TN  37203-3870
18
      For the Defendant:         David M. Hopkins
19                               Attorney at Law
                                 745 S. Church Street
20                               Suite 303
                                 Murfreesboro, TN  37130
21
      Also Present:              Kurt Wiest
22

23    Patricia A. Jennings, RMR, CRR
      Official Court Reporter
24    837-A U.S. Courthouse
      Nashville, TN 37203
25    patty_jennings@tnmd.uscourts.gov
```

```
1                      I N D E X

2
                   DEFENDANT'S PROOF
3
   MONICA GRIZZARD
4       Direct Examination by Mr. Hopkins...............   10
        Cross-Examination by Ms. Aldridge...............   17
5

6

7                 GOVERNMENT'S EXHIBITS

8   NUMBER              DESCRIPTION                      PAGE

9   1        Photo                                        25

10  2        Davidson County Criminal Court Judgment      25

11  3        Davidson County Criminal Court Judgment      25

12  4        Davidson County Criminal Court Judgment      25

13  5        Davidson County Criminal Court Judgment      25

14  6        Davidson County Criminal Court Judgment      25

15  7        Facebook photo of defendant                  26

16  8        Facebook photo of defendant                  26

17  9        Facebook photo of defendant                  26

18  10       Facebook photo of defendant                  26

19  11       Facebook photo of defendant                  26

20

21

22

23

24

25
```

1       The above-styled cause came to be heard on

2   January 24, 2020, at 10:00 a.m., before the Honorable William

3   L. Campbell, Jr., District Judge, when the following

4   proceedings were had, to-wit:

5

6       THE COURT:  Okay.  Good morning.  We're here on

7   case 3:18-cr-237 for a sentencing hearing in United States

8   versus Ramey.  If counsel will introduce yourselves for the

9   record, please.

10       MS. ALDRIDGE:  Juliet Aldridge and Dean Atyia for

11  the United States.

12       MR. HOPKINS:  Good morning, Your Honor.  David

13  Hopkins for Terious Ramey.

14       THE COURT:  Okay.  Welcome.  Okay.  The hearing

15  today will involve several steps.  First, I'll review the

16  presentence report and address any objections to that report.

17  And I'll review the sentencing guidelines and rule on the

18  appropriate sentencing range and other components of the

19  sentence.  The next step will be very important, and that

20  will involve my hearing anything the defendant may want to

21  say, if he chooses to speak.  And I'll also hear the

22  arguments of counsel as to the appropriate sentence and any

23  witnesses that the parties may want to call.  Finally, I'll

24  review a number of factors I'm required to consider under

25  Section 3553(a) to determine the appropriate sentence in this

1  case and announce how those factors influence my decision.

2  At that point, I will announce the sentence and advise the

3  defendant of his appeal rights.

4         Now, to prepare for this hearing, I've read the

5  presentence report that was dated December the 23rd of last

6  year; the defendant's sentencing memorandum, with a number of

7  exhibits, Docket Entry 102; the defendant's position with

8  respect to the presentence report, Docket Entry 98; the

9  government's position regarding the presentence report,

10  Docket Entry 97; and the government's sentencing memorandum,

11  Docket Entry 99.

12         I've listed a number of documents, Mr. Ramey, that

13  I read to prepare for today.  Did you have the opportunity to

14  see and read those documents?

15         THE DEFENDANT:  Uh-huh.  Yes, sir.

16         THE COURT:  Okay.  All right.  On September

17  the 24th of 2019, a jury rendered a verdict of guilty against

18  defendant on Counts One and Two of the Indictment that was

19  dated September the 5th, 2018.  Those charged the defendant

20  with, in Count One, felon in possession of a firearm and

21  Count Two, felon in possession of ammunition.

22         Now, I mentioned earlier the presentence report.

23  Have you read every page and every line of that document,

24  Mr. Ramey?

25         THE DEFENDANT:  Yeah.  Yes, sir.

```
 1            THE COURT:  You have?  Okay.  Is there any part of
 2   if you did not understand?
 3            THE DEFENDANT:  I don't understand how I'm an
 4   armed career criminal.
 5            THE COURT:  Okay.  Did you have the opportunity to
 6   talk with your lawyer about the presentence report?
 7            THE DEFENDANT:  Yeah.
 8            THE COURT:  Okay.  Was he able to answer the
 9   questions you asked him?
10            THE DEFENDANT:  Yeah.
11            THE COURT:  Okay.  Are you satisfied with the
12   representation of your lawyer today?
13            THE DEFENDANT:  Yeah, I guess.
14            THE COURT:  Okay.  Now, based on the filings
15   before the hearing, the Court was advised that the government
16   does not have any objections to the presentence report.
17            Is that still the case, Ms. Aldridge?
18            MS. ALDRIDGE:  It is, Your Honor.
19            THE COURT:  And the defendant raised two
20   objections.  One related to a reference in the presentence
21   report to an affiliation with a gang.  And that is on page 3
22   of the presentence report.  And that is that he denies
23   affiliation with that gang.
24            Is that a fair summary of your position?
25            MR. HOPKINS:  Yes, Your Honor.
```

1    THE COURT:  And it looks like the basis for that

2 was on certain tattoos and information received from Metro

3 Nashville Police Department.  There had been a request for

4 that.  The purpose of this is, of course, to notify the BOP

5 of any potential gang affiliations.

6    What I plan to do there is add to -- direct

7 Probation to add to that footnote that the defendant denies

8 any affiliation with that gang.

9    MR. HOPKINS:  Thank you, Your Honor.

10    THE COURT:  Okay.  The second objection is for a

11 broad brush objection to paragraphs 9 through 15 of the

12 presentence report that contains the factual basis for the

13 charge that the -- and as I understand that objection,

14 Mr. Ramey had pled not guilty, maintains his innocence on

15 these charges and therefore disputes the factual basis

16 underlying the charge.

17    Is that a fair summary of your position?

18    MR. HOPKINS:  That is, Your Honor.  Thank you.

19    THE COURT:  Okay.  Well, the Court, through the

20 trial, heard the evidence presented.  Is there anything else

21 you want to say on that, Ms. Aldridge, other than the

22 evidence adduced at trial?

23    MS. ALDRIDGE:  No, Your Honor.

24    THE COURT:  Okay.  The Court heard that evidence

25 and finds that there's a factual basis for paragraphs

1 9 through 15 of the presentence report.

2        Is there any specific thing in there, Mr. Hopkins,

3 or was it merely a denial of the underlying factual basis?

4        MR. HOPKINS:  It is a denial of the underlying

5 factual basis, but particularly Mr. Ramey would like to

6 object to paragraph 10 regarding what they observed allegedly

7 regarding marijuana.  That was litigated before my

8 representation in a motion to suppress.

9        THE COURT:  Okay.  All right.  So other than

10 general denial of the allegations based on his maintenance of

11 a position of his innocence and the specific objection to

12 paragraph 10, which references marijuana residue on pants and

13 refusing -- is this also relating to refusing to put his

14 hands behind his back?  Just that whole paragraph?

15        MR. HOPKINS:  That whole paragraph.

16        THE COURT:  Okay.  The Court finds that a

17 determination of a ruling on that particular objection is

18 unnecessary for the purposes of sentencing.  That is a little

19 bit of the background of his arrest, and I won't consider the

20 particular factual allegations in paragraph 10 when

21 considering the Section 3553(a) factors.

22        So given that, I'll accept the facts contained in

23 the presentence report as true and rely on them for

24 sentencing purposes, with the caveat that I just provided.

25        All right.  Although the guidelines are no longer

mandatory, Mr. Ramey, they are a starting point in
determining the appropriate sentence. Here, there's a base
level of a 20. However, because of the armed career criminal
statute, that changes the offense level to a 33. In terms of
criminal history calculation, the points -- you were assessed
19 points, which would place you in Criminal History
Category VI. Additionally, because you qualify as an armed
career criminal, that also would give you a Criminal History
Category VI.

So according to the guidelines, a total offense
level of 33 and a Criminal History Category of VI results in
a sentencing range of 235 to 293 months of imprisonment.
Probation is not authorized under the guidelines. And the
guideline range for supervised release is two to five years.
The guideline range for a fine is 35,000 to $250,000.
There's a special assessment of $100 per count. Here that
would be $200. Additionally, there is a mandatory minimum of
180 months due to the armed career criminal.

Are there any objections to the guideline range
that I've just announced?

MS. ALDRIDGE: None from the government,
Your Honor.

MR. HOPKINS: No, Your Honor.

THE COURT: Okay. All right. As I mentioned at
the beginning of the hearing, Mr. Ramey, there are a number

of factors I'm required to consider to determine the
appropriate sentence in this case. We've talked about the
mandatory minimum, but the guideline range is much higher
than that. And to determine the appropriate sentence in this
case, I consider these factors. I'll list them for you now.
We'll go back through them in a little while.

First is the nature and circumstances of the
offense and the history and characteristics of the defendant.
I also am to look to the need for the sentence imposed. This
touches on a number of issues, including reflecting the
seriousness of the offense, promoting respect for the law,
providing just punishment for the offense, affording adequate
deterrence, protecting the public from further crimes of the
defendant and providing the defendant with needed educational
or vocational training, medical care or other correctional
treatment in the most effective manner. I'm also to consider
the kinds of sentences available. Here, we have a mandatory
minimum due to the armed career criminal. There's also the
guideline range that I've just gone over, is another kind of
sentence that's available. I'm also to avoid unwarranted
sentencing disparities among defendants with similar records
who have been found guilty of similar conduct.

Now, to allow me to apply those factors, I'll --
are you planning on calling anybody, Mr. Hopkins?

MR. HOPKINS: Your Honor, I do have one witness,

1  his mother, Monica Grizzard.

2          THE COURT:  Okay.

3          MR. HOPKINS:  She submitted a letter, but there

4  are a couple of matters she wants to address related to what

5  the government mentioned in their brief.

6          THE COURT:  Okay.  Would you prefer to go ahead

7  and call her before I hear from Mr. Ramey, or how do you want

8  to sequence it?

9          MR. HOPKINS:  I would.

10          THE COURT:  Okay.

11          MR. HOPKINS:  I would like to call her first.

12          THE COURT:  Let's go ahead and call her then.

13          MR. HOPKINS:  Okay.  Monica Grizzard, please.

14          COURTROOM DEPUTY:  Raise your right hand, please.

15                    MONICA GRIZZARD,

16  called as a witness, having been duly sworn, was examined and

17  testified as follows:

18          THE WITNESS:  I do.

19          COURTROOM DEPUTY:  State your full name for the

20  record, please, and spell your last.

21          THE WITNESS:  Monica Denise Grizzard,

22  G-R-I-Z-Z-A-R-D.

23                    DIRECT EXAMINATION

24  BY MR. HOPKINS:

25  Q.   Good morning, Ms. Grizzard.

1  A.    Good morning.

2  Q.    You are related to Mr. Terious Ramey in the courtroom?

3  A.    Yes, sir.  I am his mother.

4  Q.    And how old is Mr. Ramey?

5  A.    27.

6  Q.    So would it be fair to say you've known him his whole

7  life?

8  A.    Yes, sir.

9  Q.    You have submitted a letter to the Court discussing both

10 yours and Mr. Ramey's life; is that correct?

11 A.    Yes, sir.

12 Q.    I'm not going to go over all of those details again.  I

13 just want to ask you a little bit about Mr. Ramey.

14             How many children does Mr. Ramey have?

15 A.    He has a total of eight kids.

16 Q.    Okay.  Is there a possibility of a ninth?

17 A.    Yeah, there is a possibility of a ninth.

18 Q.    Okay.  And you say "possibility."  Why is that not

19 definite?

20 A.    It has never been confirmed that the child is

21 biologically his.

22 Q.    Okay.  So to your knowledge, there's been no DNA testing

23 on that child?

24 A.    No DNA testing.

25 Q.    But the other eight children, there's no doubt?

1 A. Right.

2 Q. As a child, was Mr. Ramey violent or abusive or in any

3 way inappropriate?

4 A. No. Terious lost his father at 13 months, which was,

5 you know, really young for -- and him and his father, the

6 little time his father was here, he spent a lot of time with

7 him. But as a child growing up, he wasn't violent or

8 anything.

9 Q. Okay. Well, as he grew up, did he have any male role

10 models in his life?

11 A. He did. He grew up in a close-knit family, both sides.

12 On his dad's side, there's a lot of males. He was really

13 close to his great-grandfather, whom he also lost at 17. And

14 his record will kind of show he started getting in trouble at

15 that time, because that was like the male role model also.

16 Q. Was he also close to his father's mother, his

17 grandmother?

18 A. Yes.

19 Q. And was there a time when he lost her as well?

20 A. Yes. He lost her about 10 years old. He was about in

21 the fourth grade.

22 Q. Okay. Did you notice any changes in Mr. Ramey in either

23 or both of those losses?

24 A. When he lost his granny, in school he did start to

25 change in some behavior. He started asking a lot of

questions about his father.  You know, he wanted to, you

know, just know what happened, which was showing that he was

missing his father, you know.  He always shared with me how

he wish he had his father, you know.

So, yeah, about fourth, fifth grade is when I

began to see as a mother that it was affecting him.

Q.    And does he have brothers and sisters, Mr. Ramey?

A.    He has two sisters.

Q.    Okay.  And are they both younger than him?

A.    Yes.

Q.    What kind of big brother was he?

A.    He's always been a loving big brother.  He loves his

sisters dearly.  He loves his sisters dearly.  As I stated,

my kids -- we grew up in a tight-knit family.  So my kids are

close-knit.  They love each other.  And he's always been a

brother that -- big brother that, you know, look over his

sisters, want to be a protector, you know, want to make sure

that they're all right.

Q.    Are you aware of Mr. Ramey's prior criminal history, at

least in general?

A.    Yes.

Q.    Are you aware of when he was a juvenile that there may

have been an allegation of a rape?

A.    Yes, I am.  That was with my niece, whom has significant

amount of issues.  She has did this to her brothers -- her

brother. She has filed false allegations against several
people. So, you know -- and at the time when that happened,
Terious was never found guilty. Terious seeked counseling.
And upon me taking him to counseling, the counselor let me
know that the only thing that gave Terious a charge was the
age difference, because she said that actually my niece was
the perpetrator in that event.

Q. Okay. And did there come a time later as an adult that
this same niece made allegations again?

A. Yes, this same niece. She just -- she has deep issues.
She grew up in an environment where mom was a prostitute and
bringing all kind of things in and out of her life, you know.
So she -- I mean, she's -- it's just very dysfunctional.

Q. So to your knowledge, was Mr. Ramey convicted in either
of those occasions?

A. No.

Q. Are you aware of his other charges that he's had since
turning an adult, burglaries and things like that?

A. I'm aware of a few of -- I know that he's been
incarcerated for things.

Q. Okay. Prior to his arrest in this case, how long had he
ever been in custody before?

A. Terious has served -- I know it's been, you know, like
two years or -- you know, he served time before in Metro
custody.

1  Q.    Okay.  And do you know how long he's been in custody
2  this time?
3  A.    This time he's been in custody since '17 -- wait, this
4  is -- '18.  He's been in custody since '18.  So he was picked
5  up in August 2018.  He was picked up in August 2018.  It was
6  a little after his friend, Daniel Hambrick, was killed by a
7  Metro police officer.  And that's what this case originally
8  surrounded itself around.  And I don't think that during
9  Terious's trial that was brought to surface, that he could
10 possibly have been targeted through the whole thing.
11 Q.    But as far as his adulthood, would it be fair to say he
12 spent approximately four of his six or seven adult years
13 incarcerated?
14 A.    Yes, I would say.
15 Q.    Okay.  Since he's been an adult, you mentioned that he
16 has at least eight children, possibly nine.  Have you
17 observed him as a father?
18 A.    Yes.
19 Q.    And can you tell the Court just briefly about that, what
20 you've observed?
21 A.    He's very loving to his kids, caring.  He spends time.
22 Even with his incarceration, he stays in touch with them,
23 concerned about what's going on with them, you know.  He
24 talks to them constantly, you know, asking me as his mother
25 to, you know, just, you know, look after them while he's

1 going through the situation that he's in. And I do do that
2 as a grandmother and as a mother.
3 Q. Have you observed whether or not Mr. Ramey has matured
4 in the last few years?
5 A. Yes. Terious, you know, he will admit that I am a
6 mother that throughout his childhood has always told him
7 about life. And now as a mother, I can see that he is
8 maturing, and he's understanding those things that I have
9 spoke to him previously to now it's beginning to stick with
10 him, that, you know, life -- there's serious -- you know,
11 it's serious, and, you know, consequences come behind
12 choices. And, you know, sometimes you can be put in an
13 unfair situation, you know, but you have to go through it.
14 And I can see maturity in him.
15 Q. Are there other family members here in support of him
16 today?
17 A. Yes, there is.
18 Q. Who's here for him?
19 A. His two sisters and his oldest cousin.
20 Q. All right. And what's her name?
21 A. Shatoria Kirby.
22 Q. All right. At some point, when Mr. Ramey is released,
23 do you know whether he'll have the support of your family?
24 A. Oh, yes. Yes. He has support of family with this
25 incarceration. He also -- from both sides. As I stated,

1  Terious has grown up in a close-knit family from both sides.

2  And, you know, everybody supports him, you know.  You know,

3  we do what we can to keep him stable while he's there because

4  we know that he's in need.  And everybody is in support of

5  his kids while he's -- so, yeah, everybody's in support of

6  him.

7  Q.  Do you anticipate that support will continue while he's

8  incarcerated?

9  A.  Oh, yes.

10       MR. HOPKINS:  Your Honor, I think those are all my

11  questions.

12       THE COURT:  Okay.  Any questions, Ms. Aldridge?

13       MS. ALDRIDGE:  Just briefly, Your Honor.

14                    CROSS-EXAMINATION

15  BY MS. ALDRIDGE:

16  Q.  Good morning, Ms. Grizzard.

17  A.  Good morning.

18  Q.  You said that your son had a close-knit family on both

19  sides; is that correct?

20  A.  Yes.

21  Q.  And that everybody supported him?

22  A.  Yes.

23  Q.  And was that all through his growing up years?

24  A.  Yes.

25  Q.  Even when he was getting in trouble once he was 18, did

1  they still support him?

2  A.   Yes.   Not supporting the wrongdoing --

3  Q.   Sure.

4  A.   -- but, yes, we've always supported him and been there

5  for him.

6  Q.   Gave him support.  I would imagine you, yourself, tried

7  to guide him into the right way; is that correct?

8  A.   Always have.

9  Q.   Yes.  And gave him every opportunity, I would imagine,

10  to hear your counsel and turn to not breaking the law, would

11  you say?

12  A.   I would say yes.  And I would also say that, as we know,

13  everybody's entitled to making mistakes --

14  Q.   Sure.

15  A.   -- in their life.  Everybody's going to make a mistake.

16  Going to make mistakes.  Uh-huh.

17  Q.   Sure.  Were you aware of his social media accounts,

18  where he would post photos of himself?

19  A.   I, myself, I'm not a social media -- I'm not a social

20  media person.  I tell my kids, my nieces, nephews and

21  everything, that social media is not a friend to anybody.

22  Q.   So you weren't aware of his social media accounts or

23  what he was posting on those?

24  A.   I don't go on social media.

25              MS. ALDRIDGE:  Okay.  Thank you, ma'am.  Those are

1 all my questions.

2          MR. HOPKINS:  Nothing further.  Thank you.

3          THE COURT:  You may step down, ma'am.

4          (Witness excused.).

5          THE COURT:  Any other witnesses, Mr. Hopkins?

6          MR. HOPKINS:  No other testimony, Your Honor.

7          THE COURT:  Okay.  Mr. Ramey, in order to apply

8 the factors that I listed earlier for you --

9          MR. HOPKINS:  Your Honor, if I may, he does want

10 to allocute, but I didn't know when you wanted to do that.

11 So when I said no other witnesses, I meant no other --

12          THE COURT:  Sure.  Sure.  I was not counting

13 Mr. Ramey.

14          MR. HOPKINS:  Thank you.

15          THE COURT:  I didn't know if you had any

16 third-party witnesses.  But in order for me to apply those

17 factors, in addition to the information I've received in the

18 presentence report and the arguments of counsel and hearing

19 from your mother, I'll now hear anything that you may want to

20 say.  It's completely up to you whether you want to say

21 anything at all, but if there's anything that you would like

22 to say, I'll hear from you now.  You can stay seated.  I can

23 hear you as long as Mr. Hopkins will pull that microphone a

24 little closer to you.

25          THE DEFENDANT:  All right.  For the record, I want

1  to -- I want to file for my appeal off the top today.  I

2  would like to file today.

3          THE COURT:  Okay.  We will get to that.

4          THE DEFENDANT:  All right.  He say he got some big

5  cases going on.  So I'm needing the lawyer to file for the

6  appeal today.

7          THE COURT:  We will talk about that at the end.

8          THE DEFENDANT:  Your Honor, with all due respect,

9  I would like to object to everything in this case, and I

10  would like to file for my appeal today.  Also, for the

11  record, Kurt Wiest testified under oath at my detention

12  hearing that he did not start his investigation on this case

13  until July the 31st, after my best friend was killed by Metro

14  Police July the 26th.  I feel that's the only reason this

15  case even came this far, and I'm -- and got me sitting here

16  today.

17          I got two aggravated burglary convictions back in

18  2012.  And that's -- and that was ran together.  And Juliet

19  Aldridge says I'm an armed career criminal after them

20  charges.  I feel I've been misrepresented due to conflict of

21  interest being that my lawyer was an ex-cop.  Also, both

22  officers that testified at my suppression hearing and my

23  trial had inconsistent statements about my whereabouts at the

24  time of my arrest.  This case started because the officer

25  said he seen marijuana on my pants, but there were never no

evidence that such even existed.  They testified under oath
it was never a traffic stop, and I was on the other side of
the street when I was detained.  This car, or nothing in it,
had nothing to do with me.  My fingerprints are not on the
gun, and it was not in my possession or within my immediate
reach.

So, Your Honor, I'm asking for you to take
everything inconsistent before sentencing me, so I can get
home to my kids and help my family, protect my family.

THE COURT:  Okay.  Thank you, sir.  I'll now hear
any arguments of counsel for the appropriate sentence.  We'll
start with you, Mr. Hopkins.  I've read your brief, but if
there's anything additional you'd like to say, then I'll hear
it now.

MR. HOPKINS:  Thank you, Your Honor.  I won't
belabor everything in my brief, Your Honor, but I've attached
a couple of exhibits that are very important for the Court's
consideration today.  They're Exhibits 1 and 2.  Those
exhibits outline that from an early age Mr. Ramey had
suffered from some pretty significant cognitive impairment.
As set forth in the reports that I mentioned in that, he had
a cumulative IQ of 68.  And per this report, that is --
that's as low as it gets under classification.  That falls
under the extremely low category in the tests that they gave
him when he was in school.  The observations of the teachers

1  are in that report as well.  I know the Court's read those.

2          So Mr. Ramey is someone that started out life with

3  a father who was murdered and laboring under these cognitive

4  issues.  And on top of that, we see from the jail records

5  from his previous incarceration he's been diagnosed with some

6  pretty significant mental health issues as well.  So that's

7  how we get to today.

8          Mr. Ramey's convictions that are the basis for him

9  having a 15-year mandatory minimum occurred when he was only

10 19 years of age.  I know that that's -- doesn't affect

11 whether he falls within that or not, but that's certainly

12 something the Court needs to consider when deciding what's an

13 appropriate sentence in this case.

14         So when you take someone with his cognitive

15 impairments, his mental health issues and a rough start in

16 life, you end up, not surprising, with someone who may have

17 had a gun.  It's also documented, and the presentence report

18 writer noted, that Mr. Ramey himself has been shot twice.  So

19 he's a relatively young man who has these issues, who has a

20 realistic fear for his own safety in the community.  And it's

21 not surprising that there might have been a gun under a car

22 in which he was driving.

23         Of course, he still maintains his innocence on

24 that and is not conceding that in any way.  And I don't want

25 the record to be conflicted on that.  But we do see that

1  there has been problems.  And, yes, people do make bad

2  decisions.  I make bad decisions.  The Court could possibly

3  make bad decisions.  But I would hope that, you know, we

4  would make better decisions than someone who has the learning

5  disability -- or the cognitive disability -- I won't say

6  learning disability, but cognitive issues that Mr. Ramey has

7  with his starting out with an IQ and then putting on top of

8  that, you know, severe bipolar with psychosis on top of that.

9          So, you know, I just -- I don't know if it's just

10  to hold him to a standard and say, well, you know, you should

11  be making the best decisions in the world, but we do because

12  the law is the law, but you do have leeway in sentencing to

13  consider those matters in deciding what is the least severe

14  measure that the Court needs to impose in this case.

15          So based on the argument that I presented in my

16  sentencing memorandum on behalf of Mr. Ramey and the exhibits

17  that you, I know, have observed, I would submit that

18  180 months or, you know, the 15 years that he has the

19  mandatory minimum on, is the most that the Court should

20  impose in this case.  The extra 55 months that the government

21  is asking for is not going to do anything to satisfy the

22  other conditions or the other factors that the Court has

23  mentioned about deterrence and keeping Mr. Terious Ramey from

24  committing future crimes.

25          Also cited in my sentencing memorandum are some

1  statistics from the United States Sentencing Commission that
2  shows that lengthier sentences don't necessarily mean that
3  someone's not going to cause problems in the future.  In
4  fact, sometimes it's to the contrary.  A 15-year sentence in
5  this case is sufficient, but not greater than necessary, for
6  all the reasons that I've cited.  And we're asking the Court
7  to impose that sentence in the case for the reasons set forth
8  in our sentencing memorandum.
9          THE COURT:  Do you have any thoughts on a term of
10 supervised release?
11         MR. HOPKINS:  I don't, Your Honor.  That's -- I
12 think the range is two to five in this case.  I'll leave that
13 in the Court's discretion.  I will say that someone that has
14 mental health issues and those impairments might need
15 supervision longer than two years.  So it might be necessary
16 that he get that support when he gets out.  But hopefully
17 with 15 years, which is the minimum he's facing in this case,
18 that the Bureau of Prisons will provide him and get him set
19 up so that he is adequately medicated, treated, counseled and
20 hopefully has some skills that he can translate into him
21 being a successful citizen when he's released.
22         He's still going to have those issues.  Those
23 issues won't go away.  So the term of supervised release, I
24 think, you know, when the Court sets conditions, of course,
25 mental health counseling and treatment and those things, we

1 would not object to that being a condition.

2     THE COURT:  Okay.  Thank you.  Ms. Aldridge.

3     MS. ALDRIDGE:  Yes, Your Honor.  I just wanted to

4 fill in a few things that were noted in the sentencing

5 memorandum.  Specifically, I have marked Government's

6 Exhibits 1 through 6, which are certified copies of the

7 felony convictions of Mr. Ramey.  So if I could tender those

8 at this time.

9     THE COURT:  Any objections to those, Mr. Hopkins?

10     MR. HOPKINS:  No, Your Honor.  I've been provided

11 a copy.

12     THE COURT:  Okay.  These will be admitted as

13 exhibits to this hearing.

14     (Government's Exhibits 1 - 6 received in

15      evidence.)

16     MS. ALDRIDGE:  Then further, I had some exhibits

17 from Mr. Ramey's Facebook page.  At trial, I believe the

18 certificate for the business records was entered as an

19 exhibit, and Your Honor heard testimony from Agent Wiest

20 about that Facebook page.  Government's Exhibit 7 was

21 uploaded on April 11th of 2018.  As Your Honor knows, this

22 incident occurred on June 4th of 2018.  This shows what we

23 would submit is a bouquet of firearms in the defendant's

24 possession.  Also, on that same date, Government's Exhibit 8

25 shows the defendant with a long gun or rifle-style firearm on

April 30th of 2018. Again, we have the defendant -- this is
Government's Exhibit 9 -- the defendant with another
long-style gun. Then, again, the incident occurred on
June 4th of 2018. We have Government's Exhibit 10, which is
the defendant, and was uploaded to Facebook on July 25th of
2018, with a Beretta-style firearm with an extended magazine.
Government's Exhibit 11 was uploaded on July 26th of 2018,
again, with the same style firearm. The defendant is holding
in his hand a cigarillo that we would submit is of the same
type described by the officers from June 4th of 2018. So I
would tender those exhibits for sentencing purposes at this
time, Your Honor.

       THE COURT: Any objection, Mr. Hopkins?

       MR. HOPKINS: No, Your Honor.

       THE COURT: Okay. These exhibits will be admitted
as exhibits to this hearing.

       (Government's Exhibits 7 - 11 received in
        evidence.)

       MS. ALDRIDGE: Further, Your Honor, I'd just like
to proffer -- we referenced the August 21st, 2018,
apprehension of Mr. Ramey in the sentencing memo. I,
personally, have talked with a victim of that particular
incident. I'll term her L.P. she was the pedestrian who was
standing by the side of the interstate and was struck when
Mr. Ramey crashed his car into some stationary vehicles as he

1    was fleeing from pursuing police vehicles.  She had to go to

2    the hospital.  She had medical bills.  She worked with our

3    office, specifically John Hernandez, to get victim's

4    compensation.  We did try to contact her to see if she wanted

5    to speak here today, but were unable to contact her at this

6    point.  So I would just proffer that, that Mr. Ramey's

7    actions are dangerous and have had an impact on the

8    community.

9              As I said in my sentencing memorandum, those

10   charges were dismissed.  I'm not entirely sure why, since

11   there was a victim in the community, but my guess is that

12   Davidson County felt, since he was going into federal

13   custody, they would just simply let all of his actions be

14   dealt with here in the federal court.

15             Again, I won't belabor the point, but I think in

16   the brief time Mr. Ramey has had to form a record and show us

17   who he is, he has shown us that he is someone who does not

18   obey the law, who does not follow the rules.  Instead of

19   accepting responsibility for his actions on June 4th of 2018,

20   as is his right, he went to trial.  The government proved his

21   guilt.  And now there should be -- he should not get the same

22   benefit that those who do take responsibility for their

23   actions do, and that he should not simply get what others get

24   before trial.  And that's reflected in the guidelines.  And

25   we feel that that's an important aspect of sentencing, as

well, is that general deterrence, that if you don't take
responsibility for your actions, you don't get the same
benefit as those who do.

So we would ask you to give a guideline sentence.
We think the bottom of the guidelines is sufficient in this
case and would ask for those 235 months.  As Mr. Hopkins
referenced, we do feel Mr. Ramey needs to be under
supervision in the community as long as possible.  So we
would ask for five years of supervised release as well.

THE COURT:  What are your thoughts on
Mr. Hopkins's point as to, you know, but for armed career
criminal, we'd be looking at a very different guideline
calculation range, and that armed career criminal -- the
impact of that is -- really changes the dynamic when you look
at sufficient, but not greater than necessary?  What are your
thoughts on that?

MS. ALDRIDGE:  Your Honor, I think that Congress
has seen fit to pass that for a reason, because people that
continue to commit violent felonies are worthy of more
punishment than those that don't.  Although it would be a
different base level offense, the criminal history would be
the same, the criminal history category.  He has continuously
managed to up that criminal history category.  And although
the base level offense for just a first-time prohibited
person who possesses a gun is fairly low, given all of the

criminal history and, frankly, things he's gotten away with, like the reckless driving and injuring people on August 21st of 2018, I think the heightened punishment is warranted in this case.

THE COURT:  Okay.  Anything else, Mr. Hopkins?

MR. HOPKINS:  Briefly, Your Honor.

THE COURT:  Yes.

MR. HOPKINS:  One other thing I'd like to point out, too, that I failed to do so was that when Mr. Ramey's case was originally brought here in federal court, under Sixth Circuit precedent he was not an armed career criminal. So he started making decisions about trial and how to proceed before the United States Supreme Court reversed the Sixth Circuit.  So but for that decision, had that held or had he been able to plead guilty earlier, he wouldn't be looking at a 15-year sentence either.

So the only thing that's changed for Mr. Ramey is an opinion that came down while this case was pending.  So again, when you look at all of the factors that are applicable here under 3553(a), 15 years, Your Honor, for something he probably would have gotten, you know, three to five years for, but for that change, is certainly something the Court has to consider, that he's looking at probably three times more than he would have a year ago.  And that's through no fault of his own.  And that's what Congress had

 1   intended, at least according to the Sixth Circuit for a
 2   while.
 3            THE COURT:  Okay.  So to summarize, the government
 4   seeks a sentence of low end of the guideline range, which is
 5   235 months, plus a lengthy term of supervised release.  The
 6   defendant seeks the mandatory minimum of 180 months and
 7   acknowledges that some period of supervised release at the
 8   discretion of the Court would be appropriate at a minimum for
 9   continuing programming for things like mental health and
10   substance abuse.
11            The basis for the variance, as I understand it,
12   that's sought by the defendant is the significant impact of
13   armed career criminal, the difficult childhood that included
14   loss of important people in Mr. Ramey's life along the way.
15   And I think something that hasn't really been touched on much
16   here today, but is certainly in the filings and reflected in
17   the presentence report, is exposure to drugs and alcohol at a
18   very young age, very, very young age.  And all of that, as I
19   understand it, is the basis for the request for a variance to
20   the 180 months.
21            The Court is required to impose a sentence
22   sufficient, but not greater than necessary, to comply with
23   the purposes of the sentencing laws passed by Congress.
24   Under Section 3553(a), I'm required to consider a number of
25   factors.  I listed those for you earlier, Mr. Ramey.  I'm

1 going to go back through many of them now.

2       The nature and circumstances of the offense.

3 Certainly carrying a gun as a felon, with drugs involved in

4 some form or fashion, is serious, whether they were present

5 in the car. We didn't deal with that with the jury based on

6 my rulings because I did not think the jury needed to hear

7 about that, but there were certainly drugs around. That's

8 all serious.

9       Your history and characteristics are a bit of a

10 mixed bag. You had some definite challenges in your

11 childhood. You've also got a mother who has stuck by you,

12 continues to stick by you, a very impressive woman. And the

13 PSR reflects that your basic needs were met. You had support

14 of family around at different stages of your life, and there

15 wasn't any noted abuse involved. However, the drugs at a

16 young age, for whatever reason, those came on the scene.

17 Science is telling us that, notwithstanding more open views

18 towards things like marijuana, the impact on a young brain is

19 significant. And you started using those substances really

20 before adolescence. And there's little doubt in my mind that

21 had a big impact on you.

22       You know, additionally, there's not a meaningful

23 history of employment to look at here, where you've shown

24 that you can sort of settle in and work. And the financial

25 obligations to your children that have mounted up, while you

might be attentive to them, that lack of support, which is
probably tied to the lack of employment, is also part of the
history and characteristics.

As far as the need for the sentence imposed, I'm
to reflect the seriousness of the offense. And here it's a
gun charge. And I think, as Mr. Hopkins said, that in and of
itself, we'd be looking at a very different sentencing range
but for the Armed Career Criminal Act. But it is serious.
And you had been convicted of it before. So you knew --
whatever your reason for having a gun in the car -- I
understand you're maintaining your innocence, but the jury
saw it differently. Whatever the reasons were, you were
certainly on notice to steer clear of that. And, of course,
these pictures reflect that you haven't in other times as
well.

Promoting respect for the law. That's difficult
to find here as far as your past, but a sentence that's
designed to promote respect for the law is important.

As I said earlier, in terms of just punishment,
the ACC overlays all of this, and that changes that
assessment a bit.

Adequate deterrence. There's clearly a need for
deterrence here with respect to Mr. Ramey given his criminal
history and previous convictions for the same offenses.
Society also needs to know that those with violent

1  convictions shouldn't have guns.  And that if they do, they
2  will be dealt with, and there will be accountability.

3         Protecting the public from further crimes of the
4  defendant weighs certainly in favor of a longer sentence here
5  given the criminal history.  However, the need to provide
6  educational or vocational training, medical care, or
7  correctional treatment in the most effective manner also
8  weighs heavily here with the long history of substance abuse,
9  mental health issues, perhaps some trauma from childhood with
10 respect to the loss of significant people in your life, your
11 father at a very young age, your grandmother, other key
12 individuals in your life.  Perhaps that's never been dealt
13 with.  And grief is complicated and hard, and sometimes takes
14 a while to deal with.

15        I've considered the kinds of sentences available.
16 This involves the mandatory minimum, as well as the guideline
17 range that we've talked about.

18        And the need to avoid unwarranted sentencing
19 disparities among defendants with similar records who have
20 been found guilty of similar conduct.

21        So I've considered all those factors and touched
22 on the ones that influence my decision in this case.

23        So it's the judgment of the Court that the
24 following sentence should be imposed:  You'll be committed to
25 the Bureau of Prisons for a total term of 204 months.  That's

for each count to run concurrent.  In the Court's view, the
guidelines would be greater than necessary in this case for
the reasons I've already stated; however, a 180-month
mandatory minimum would not be sufficient given those
factors, which include the defendant's history, the need for
deterrence and the lack of respect for the law and his past
and the need to promote respect for the law in the future.
Also, the prior conviction for the same crime is particularly
troubling here, as well as his continued possession of
firearms as documented by the government.

The variance is based on a number of factors we've
already touched on, some significant challenges at a young
age.  I'm also factoring in the harsh impact of the armed
career criminal here, the act here, because it certainly
changes the guidelines and the calculations.

As far as recommendation -- as well as the drugs
at a young age, which I've talked about, is a basis for the
variance.

As far as recommendations, I'm inclined to
recommend that he receive substance abuse treatment while
incarcerated.  We have programs.  One of them is RDAP, and
there's others that Bureau of Prisons will assess Mr. Ramey
for.  I gather you want him housed as close to Nashville as
possible for family support?

MR. HOPKINS:  Yes, Your Honor.

1        THE COURT:  Okay.  I'll make that recommendation
2   as well.  What about mental health?
3        MR. HOPKINS:  Yes, Your Honor.
4        THE COURT:  And, you know, one thing that I
5   wondered about is whether we need to -- either on supervision
6   or potentially programming while incarcerated, issues with
7   anger management.  There's some violence in the background,
8   some domestic violence.  That often makes me wonder whether
9   there's some need for additional treatment.  I can recommend
10  it or not.  It may also flow into the mental health piece of
11  it anyway.  We'll just leave it at that and not touch on a
12  specific recommendation as to anger management.
13        What about vocational training?  We've got a
14  pretty sparse employment history here.
15        MR. HOPKINS:  Yes, Your Honor.  I've asked for
16  that in the memo.
17        THE COURT:  Yeah.  Is there a particular type -- I
18  I can look back.  Was there a particular one you asked for?
19        MR. HOPKINS:  I did not, Your Honor.
20        THE COURT:  Okay.  I will just put a general
21  recommendation for vocational training, so that when
22  Mr. Ramey is released, he hopefully has a marketable skill
23  that he has learned.
24        Upon release from imprisonment, you'll be on a
25  term of supervised release for three years.  That's per count

to run concurrent. Now, when imposing the conditions of
supervised release, the Court considers essentially the same
factors I've already listed. I won't go back through them
now.

The special conditions that I'm going to impose
are listed on pages 31 to 32 of the presentence report. That
includes drug testing and substance abuse at the direction
of -- treatment at the direction of Probation. And Probation
will talk with you about how that will be paid for.

You cannot possess any controlled substance
without a valid prescription. If you have a valid
prescription, you have to allow Probation to confirm that
with the prescribing physician. You will also promptly
advise Probation if you get a prescription for a controlled
substance. This is so they know that when they drug test
you, what's going to show up on the test -- legitimately show
up on the test. You'll also provide financial records and
related documents to Probation for employment verification.
And you cannot communicate with or otherwise interact with
any known member of the Bloods gang without first obtaining
permission from your probation officer.

Additionally, there are some standard conditions.
All of this will be in the judgment that you will go over
with Probation upon release. I'll go over a few of those
now. These establish the basic expectations for your

behavior while on supervision and the minimum tools needed to
keep Probation informed:

    First, you have to report to the probation office
within the federal judicial district where you're authorized
to reside within 72 hours of release from imprisonment.
Likely, that will be in this district.  You cannot knowingly
leave the district without first getting permission from
Probation.  You have to live in a place approved by
Probation.  You have to allow a probation officer to visit
you at home or anywhere else.  And you have to work a
full-time lawful employment of at least 30 hours a week.

    You cannot communicate or interact with someone
you know is engaged in criminal activity.  If you're arrested
or even questioned by law enforcement, you need to notify
Probation within 72 hours.  You cannot possess, own or have
access to a firearm, ammunition, destructive device or
dangerous weapon while on supervision.  There will be other
conditions in the judgment that you will review with
Probation upon your release.

    Additionally, you cannot commit another federal,
state or local crime.  You cannot unlawfully possess a
controlled substance.  You must refrain from the unlawful use
of controlled substances.  And that will involve one drug
test within 15 days of release.  And then we've got the other
condition that will require drug testing periodically.  You

 1  have to cooperate with the collection of DNA as directed by
 2  Probation.
 3          The Court does not impose a fine because it's
 4  determined that the defendant is financially unable to pay a
 5  fine.  However, a special assessment of $100 per count of
 6  conviction is hereby imposed.  That's $200 in this case.
 7  Restitution is not applicable in this case.  Earlier, the
 8  government filed a consent preliminary order of forfeiture
 9  relating to the firearm and ammunition at issue in the case.
10  The Court entered that this morning.  I think it's been
11  docketed while we've been sitting here.  And so the defendant
12  will forfeit the 9mm and the ammunition described in that
13  preliminary order.  That will also be part of the judgment.
14          If the guideline calculation is wrong, the Court
15  would have imposed the same sentence under Section 3553(a)
16  considering those factors as a whole.
17          Do the parties have any objections to the sentence
18  just announced that have not already been raised?
19          MS. ALDRIDGE:  No, Your Honor.
20          MR. HOPKINS:  No, Your Honor.
21          THE COURT:  Okay.  All right.  The sentence is
22  hereby ordered imposed as stated.  An appropriate judgment
23  will enter.
24          You have the right to appeal your conviction in
25  this case and appeal your sentence.

1          THE DEFENDANT:  Can I do it -- can I do it today?

2          THE COURT:  We're going to get to the mechanics of

3    how to do that in just one moment.

4          With few exceptions, the notice of appeal must be

5    filed within 14 days of entry of judgment.  Judgment will

6    likely be entered in this case today.  If you're unable to

7    pay the cost of an appeal, you can apply for leave to appeal

8    as a pauper.  If you direct your attorney to file a notice of

9    appeal in clear terms, he'll do that on your behalf.  If you

10   request that the Clerk of the Court prepare and file a notice

11   of appeal, he will do that on your behalf.  We've provided

12   you with a Notice of Appeal form, and you should use it with

13   the advice of your counsel.

14         We have a pending motion, Mr. Hopkins, about your

15   withdrawal, which I'm inclined to grant.  My main concern is

16   that something doesn't fall through the cracks with a notice

17   of appeal that Mr. Ramey has stated several times he wants --

18   intends to file and wants to file, and it's certainly his

19   right to file.  I just want to make sure that that doesn't

20   get through the cracks.  And we looked at the local rules and

21   some other things, and it's a little less than clear to me.

22         My view is, get it filed.  We'll grant your motion

23   to withdraw.  If the Sixth Circuit thinks they should have

24   granted your motion to withdraw, they can clean it up, but at

25   least he has a notice of appeal on file.

1          Is that --
2          MR. HOPKINS:  I can do that.  He does have
3    14 days.
4          THE COURT:  Yes.
5          MR. HOPKINS:  And assuming another lawyer were
6    appointed through the CJA panel between now and then, I -- I
7    would prefer that appointment happen.  And until that
8    happens, I will stay on the case.  And if it's not happened
9    and filed within 14 days of entry, I will file that.  How
10   about that --
11         THE COURT:  Okay.
12         MR. HOPKINS:  -- as a compromise?
13         THE COURT:  Yes, that's fine.
14         MR. HOPKINS:  Just so that we don't get in that
15   battle with the Sixth Circuit about who's the lawyer and
16   who's not --
17         THE COURT:  Right.  Well, and I --
18         MR. HOPKINS:  -- jurisdiction or not once I file
19   that notice.
20         THE COURT:  Right.  And I don't -- yes, those are
21   fair points.  My main concern is protecting his appeal
22   rights.
23         MR. HOPKINS:  As is mine.  And so I will tell the
24   Court I will have that on my calendar.  And if another
25   attorney has not filed it by then, or someone gets appointed,

```
 1   I will immediately contact them and advise them to get that
 2   done and help facilitate that, so he doesn't lose that 14-day
 3   window.
 4              THE COURT:  Okay.
 5              THE DEFENDANT:  Well, he got a big case coming up.
 6   So --
 7              THE COURT:  Right.
 8              THE DEFENDANT:  -- he might not have time for it.
 9              THE COURT:  We're going to make sure --
10              MR. HOPKINS:  In the next 14 days, I have plenty
11   of time.
12              THE COURT:  Mr. Ramey, I completely get your
13   concern.  We're going to make sure that your notice of appeal
14   is filed in a timely way, so that your appeal can go forward.
15   Okay?  It's got my attention.  It's got Mr. Hopkins's
16   attention.  It will have your next lawyer's attention.
17              The defendant will be remanded to the custody of
18   the Marshals for delivery to the Bureau of Prisons.
19              Anything else before I wrap up?  From the
20   government?
21              MS. ALDRIDGE:  No, Your Honor.
22              MR. HOPKINS:  No, Your Honor.
23              THE COURT:  All right.  Mr. Ramey, I know you've
24   maintained your innocence, and it's certainly your right to
25   do that.  If this sentence holds, you will be in your early
```

1   40s when you get out.  You still have children who need a
2   father in their lives, both while you're incarcerated and
3   after, even though they'll be older.  My encouragement to you
4   and my encouragement to everybody that sits in that seat in
5   these hearings is to take the time to look at how you want to
6   live the rest of your life.  You're a young man, and you've
7   got family who supports you.  You've got a very impressive
8   loving mother who came here today.  And you've got others
9   back there who are in your corner, and I know they will be
10  throughout this.  How you want the rest of that life to live
11  because you are so young.  And being involved in your
12  children's lives as well.  And I just hope that this will --
13  that you will take the time to think about that and come up
14  with a plan and be patient in that plan, even when we have
15  bumps in the road that we all have in life.
16          All right.  If there's nothing else, then we'll
17  wrap up.  All right.  Good luck to you, Mr. Ramey.
18
19          (Proceedings concluded at 11:00 a.m.)
20
21
22
23
24
25

1          <u>REPORTER'S CERTIFICATE</u>

2          I, Patricia A. Jennings, Official Court Reporter

3    for the United States District Court for the Middle District

4    of Tennessee, with offices at Nashville, do hereby certify:

5          That I reported on the Stenograph machine the

6    proceedings held in open court on January 24, 2020, in the

7    matter of *UNITED STATES OF AMERICA vs. TERIOUS D. RAMEY*,

8    Case No. 3:18-cr-00237-1; that said proceedings in connection

9    with the hearing were reduced to typewritten form by me; and

10   that the foregoing transcript (pages 1 through 42) is a true

11   and accurate record of said proceedings.

12          This the 23rd day of March, 2020.

13

14

15

16

17                    /s/ Patricia A. Jennings
                      Patricia A. Jennings, RMR, CRR
18                    Official Court Reporter

19

20

21

22

23

24

25